IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 11-cv-03341-RPM

LEVETTE KYEREMEH,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

## FINDINGS, CONCLUSIONS, AND ORDER FOR JUDGMENT

Early in the morning on May 14, 2010, Plaintiff Levette Kyeremeh (formerly Levette Clemons) was driving to work in her 2003 Ford Taurus. She was stopped at a traffic signal in the northbound lane of Quebec Street at I-70 in Denver, Colorado when a United States Postal Service ("USPS") truck slammed into the rear of her Taurus at a speed of 25 miles per hour. The impact pushed Kyeremeh's car forward into the middle of the intersection. Kyeremeh steered sharply to her right to avoid another vehicle. She was wearing a seat belt at the time.

Kyeremeh filed this civil action under the Federal Tort Claims Act ("FTCA") on December 21, 2011, seeking damages caused by the accident. Defendant has admitted that the USPS truck driver was negligent. The nature and extent of Kyeremeh's injuries caused by the collision and her present medical condition were the subject of a trial held on April 7-10, 2014.

Two particular aspects of this case warrant mention initially, as they inform the Court's findings in significant part. The first is Kyeremeh's personal history. She is a former cocaine addict and was convicted of felony drug possession in 2002. She worked as an independent contractor for a cleaning service company for low hourly pay and no benefits. With three children and a mother with Alzheimer's to support, Kyeremeh could not pay for auto insurance and had no health insurance until she received Medicaid sometime in late 2013 or early 2014. Because of Kyeremeh's inability to pay for health care, her course of treatment has been problematic.

The second is the manner in which the USPS dealt with Kyeremeh's administrative claim. The FTCA authorizes every federal agency to use arbitration or other alternative means of resolution to settle any tort claim against the United States. 28 U.S.C. § 2672. According to Department of Justice ("DOJ") guidance on how federal agencies should handle FTCA claims, the administrative claim review process is "intended to serve as an efficient[,] effective forum for rapidly resolving tort claims with low costs to all participants." 28 C.F.R. § 14.6(a). The DOJ guidance seeks to "maximize the benefit achieved through the application of prompt, fair, and efficient techniques that achieve an informal resolution of administrative tort claims without burdening claimants or the agency." Id. "Whenever feasible," the guidance states, "administrative claims should be resolved through informal discussions, negotiations, and settlements rather than through the use of any formal or structured process." Id. § 14.6(a)(1). While the guidance does not require the USPS or any other government agency to pursue a particular process, it unambiguously instructs federal agencies to make a genuine effort to resolve an FTCA claim informally and efficiently, thereby avoiding protracted and expensive litigation.

2

The USPS' approach to handling Kyeremeh's administrative claim was contrary to that guidance. Kyeremeh, through her then-attorney, Ms. Collins, filed a notice of claim on August 16, 2010, describing the circumstances surrounding the accident and stating that she (Kyeremeh) had "incurred medical expenses as a result of her injuries and . . . sustained other economic and non-economic damages . . . ." [Doc. 30, Ex. A.] Kyeremeh requested "payment of no less than $150,000.00" in money damages. [Id.] The USPS acknowledged receipt of Kyeremeh's claim on September 13, 2010 and said it would be given "careful consideration." [Doc. 30, Ex. D.] Kimberly Herbst, a USPS tort claims examiner/adjudicator, sent Collins a letter dated October 4, 2010 requesting medical records and bills for the treatment Kyeremeh received to substantiate her claim. [Doc. 30, Ex. E.] Collins notified the USPS by letter the next day that she was withdrawing as Kyeremeh's counsel. [Doc. 30, Ex. F.] It is unclear whether Kyeremeh received the USPS' October 4 letter to Collins, and what, if anything, the USPS did between October 5 and January 2011 regarding Kyeremeh's claim.

Herbst sent Kyeremeh a letter dated January 13, 2011 stating that the USPS had previously asked Collins to provide medical records, which Collins failed to do. [Doc. 30, Ex. H.] Because it was Herbst's "understanding that Attorney Collins was no longer representing [Kyeremeh]," Herbst asked Kyeremeh directly to provide the records herself. [Id.]

On February 11, 2011, Herbst sent a letter to Keith Frankl, Kyeremeh's new attorney. In the letter, Herbst noted that she and Frankl had "a recent telephone conversation" in which Frankl indicated to Herbst that Kyeremeh "was continuing to receive medical treatment and estimated that [he] will not be providing medical documentation in order to support her claim

3

until at least May of this year." [Doc. 29, Ex. 2.]  In spite of Frankl's assurances that documentation would be forthcoming and that the delay was attributable in part to Kyeremeh's ongoing treatment, Herbst flatly stated that the USPS "cannot keep this claim open for an extended amount of time without documentation in support thereof[,]" and denied Kyeremeh's claim for failure to "submit competent evidence of injury." [Id.] Herbst said that Kyeremeh could either file suit in federal court or submit a request for reconsideration of its decision.

On July 1, 2011, Frankl filed a new claim with the USPS on Kyeremeh's behalf seeking $1.3 million in damages and attaching supporting medical records and bills. [Doc. 29, Ex. 3.] The USPS responded on July 7, 2011, stating that it would deem the new claim as a "request for reconsideration" of its February 14, 2011 decision and it would "review the additional information you provided in order to make the determination as to any legal liability on the part of the Postal Service for the injuries sustained by your client." [Doc. 29, Ex. 5.] The USPS denied Kyeremeh's request for reconsideration on November 16, 2011 in a letter from USPS attorney Stanford Bjurstrom, who said that, based upon a review of the information set forth in Kyeremeh's claim file, "we feel that this claim involves issues best resolved in court." [Doc. 29, Ex. 6.] In the one year and three months that had passed since Kyeremeh initiated the USPS' FTCA administrative process, that was the only statement the USPS made regarding the actual substance of Kyeremeh's claim.

The USPS did not appear to consider Kyeremeh's physical condition or her financial circumstances when it evaluated her claim.  The USPS's obdurate refusal to attempt to resolve the matter forced Kyeremeh to initiate this action, and, in the meantime, seek medical treatment without access to high-quality care.  One may wonder what her present condition

would be if the USPS had given attention to her needs at the time it became aware of her claim.

## FACTUAL FINDINGS

At the scene of the accident on May 14, 2010, Kyeremeh told Officer Curtis Franklin of Denver Police she was not injured. When she was examined at the Emergency Department of Denver Health Medical Center, she was diagnosed with cervical strain[1] and low back pain. An x-ray of Kyeremeh's lumbar spine[2] was unremarkable. Her emergency room physician recommended that she take over-the-counter medication. Kyeremeh returned to Denver Health two days later, complaining of extreme pain. She was given a cervical collar to wear and prescriptions for Percocet and Valium to treat the pain.

Kyeremeh's first therapy provider was Dr. Tracy Holmes, a chiropractor. Kyeremeh saw Dr. Holmes on a lien basis[3] beginning on May 17, 2010. Kyeremeh initially reported functional limitations, pain in many areas, numbness and tingling, and weakness. Dr. Holmes observed that Kyeremeh had a decreased range of motion, muscle strain in the lumbar region, and severe muscle spasms throughout her spine and in her arms. Holmes performed muscle stimulation and adjusted Kyeremeh's back. Thereafter, Kyeremeh visited Holmes approximately three times per week for almost a year.

Following the accident, Kyeremeh's Taurus was deemed a total loss. Kyeremeh rented a replacement vehicle for roughly three weeks. She then purchased another car.

---

[1] "Cervical" refers to a person's neck area.
[2] "Lumbar" refers to a person's lower back region.
[3] Health-care providers who see a personal-injury claimant on a lien basis provide the claimant up-front care free of charge in exchange for an interest in the claimant's ultimate recovery from the party at fault.

On or about May 21, 2010, Kyeremeh returned to work as a janitor for ProSource, a cleaning company, on ProSource's contract with a medical device company called the Sorin Group.  Kyeremeh worked light duty and reduced hours because of her physical limitations.

Following a May 28 chiropractic visit, Dr. Holmes noted inflammation and swelling in the soft tissue of Kyeremeh's back.

On June 1 and 15, 2010, Kyeremeh went to the emergency room at St. Joseph's Hospital reporting pain all over her body and difficulty moving.  On her second visit, she was given a prescription for Percocet and Flexeril.  Dr. Holmes noted on June 23 that Kyeremeh was "feeling like she did after the accident" and recommended that Kyeremeh see a primary care physician.

Based on Dr. Holmes' referral, Kyeremeh began receiving medical treatment at PremierCare on a lien basis.  She first saw Dr. Joseph Ramos, who owned PremierCare, practiced medicine there, and owned MedLaw Funding, LLC, a medical lien provider through which parts of Kyeremeh's care were financed.  Dr. Ramos is also a practicing lawyer.  Kyeremeh received an initial intake exam from Dr. Ramos and physician's assistant Jim Peterson on July 6, 2010.  She reported significant pain in her head, neck, back, and shoulders.  Diagnostic tests indicated a lumbar disc issue.  Peterson referred Kyeremeh for physical therapy and prescribed her painkillers and muscle relaxants.

At a July 12, 2010 visit with Dr. Holmes, Kyeremeh reported severe pain; Dr. Holmes noted that it reminded her of Kyeremeh's first week of treatment.  When Kyeremeh received the medications prescribed by Peterson, she reported a 30%-40% improvement to Dr. Holmes.

On July 23, 2010, Dr. Holmes observed that Kyeremeh was limping, which Holmes believed was caused by a disc injury.

An MRI was performed on Kyeremeh's lumbar spine on August 13, 2010.  The results were read as normal except for a small central disc bulge at the L4-5 and L5-S1 levels.[4]

Kyeremeh began receiving physical therapy on August 31, 2010.  Kyeremeh reported pain and was noted as having significant range of motion deficits, hypertonicity throughout her spine[5], and spasms throughout her back and shoulders.  A compression test indicated injury to Kyeremeh's cervical disc.  Kyeremeh received heat, electrical stimulation, massage, and performed various exercises during her physical therapy sessions, which totaled roughly 40 overall from late August 2010 until late January 2011.

Following a September 17, 2010 chiropractic visit, Kyeremeh reported significant pain. Dr. Holmes began to believe that the adjustments she had been performing were not working. Five days later, upon reviewing Kyeremeh's MRIs, Dr. Holmes concluded that Kyeremeh had herniated discs.  Dr. Holmes decided to suspend adjustments and instead perform decompressions on Kyeremeh's spine over the course of twelve, twenty-minute sessions.[6]

An MRI was performed on Kyeremeh's cervical spine on September 28, 2010.  The results were read as normal except for a small disc protrusion at the C5-6 level.

During an October 4, 2010 visit with Dr. Holmes, Kyeremeh said she "[hurt] everywhere" and that her mental status was deteriorating.  Dr. Holmes referred Kyeremeh to a psychologist.

---

[4] Intervertebral discs act as cushions between the vertebrae.
[5] Hypertonicity is an excess of muscular or arterial tone or intraocular pressure that can cause nerve impingement and joint compression.
[6] Decompression is a chiropractic treatment in which a machine pulls spinal vertebrae apart to relieve pressure on the discs.

Kyeremeh visited PremierCare on October 25 and reported tenderness in the muscles over and around her facet joints.[7]  Jim Peterson noted Kyeremeh had an extremely limited range of motion and an increase in lower back pain when he applied pressure, which indicated facet dysfunction.

Kyeremeh began receiving acupuncture treatment on November 2, 2010.  She attended 10 acupuncture sessions over the course of a year and three months, until February 15, 2011.

On November 4, 2010, Dr. Holmes spoke with Jim Peterson, who recommended that Kyeremeh receive injections into her facet joints.[8]  The two decided that Dr. Holmes' continued decompressions, as well as adjustments of Kyeremeh's thoracic spine[9], would work in tandem with the injections.  Holmes decided on twelve more decompression sessions around this time.

Dr. Paul Leo, a PremierCare-affiliated pain management specialist, examined Kyeremeh on November 18, 2010, a little over six months following the accident.  He concluded that she had a facet injury or dysfunction.  He concurred in the recommendation that she be given facet injections.

Following a decompression session with Dr. Holmes on November 24, 2010, Kyeremeh reported pain and difficulty sitting up.  That same day, Dr. Holmes decided that six more decompression sessions were warranted.

Dr. Leo performed bilateral injections to Kyeremeh's lumbar facets on December 3, 2010.  Kyeremeh reported significant improvement and was able to stand and move around

---

[7] Facets are joints that connect spinal vertebrae to one another.
[8] Injections involve injecting a small amount of local anesthetic and/or a steroid medication into the facet to numb the pain and reduce inflammation.
[9] "Thoracic" refers to the chest or thorax.

without difficulty.   Two weeks later, Dr. Leo found minimal tenderness and spasm in Kyeremeh's lumbar area.  He noted, however, that Kyeremeh had gluteal spasms; tenderness over her sacroiliac joints[10]; and pain, tenderness and spasms in her cervical spine area.

Following a decompression session with Dr. Holmes on January 12, 2011, Kyeremeh reported pain and difficulty sitting up.

Eight days later, and upon Dr. Holmes' referral, Kyeremeh began seeing Dr. Trina Seefeldt for psychological treatment on a lien basis.  Following Kyeremeh's first visit, Dr. Seefeldt noted that Kyeremeh was experiencing anxiety, depression, and symptoms of posttraumatic stress, particularly while driving.

Dr. Leo performed injections to Kyeremeh's sacroiliac joints and to trigger points in the lumbar and gluteal areas on January 14, 2011.[11]   Kyeremeh reported initial relief after the injections but soon began feeling pain, spasm and tenderness; her complaints were consistent with a cervical facet problem.  Dr. Leo recommended cervical facet injections "as soon as possible" and that Kyeremeh continue with physical therapy and massage until her lumbar spasms remained improved.

In February 2011, Dr. Ramos sold PremierCare to HealthPoint, which took over the management and operation of PremierCare's medical practice.  Contrary to Dr. Leo's recommendation, Kyeremeh did not receive physical therapy for the next nine months due to concerns with the financial status of her case.

Jim Peterson, who stayed at HealthPoint following the sale, saw Kyeremeh on February 22, 2011.  Kyeremeh reported ongoing pain in her head, neck, back, shoulders and elbows.

---

[10] The sacroiliac joints lie next to the spine and connect the sacrum with the hip on both sides.  The sacrum is a triangular bone at the base of the spine that is situated between the two hip bones.
[11] Trigger points are knots of muscles that form when muscles do not relax.

Peterson noted that Kyeremeh was scheduled for repeat injections with Dr. Leo, but expressed skepticism about that approach, as Kyeremeh "did not receive significant relief" from the injections in the past.  Peterson recommended that Kyeremeh be re-evaluated.

Dr. Holmes released Kyeremeh from chiropractic treatment on April 6, 2011, noting: "She is not well. Her condition remains the same. She improves some but then seems to regress. I believe there is some disability and I will recommend to her attorney a disability rating."  By the Court's count, Kyeremeh visited Dr. Holmes on 85 separate occasions from May 2010 until April 2011.

On April 11, Kyeremeh saw Dr. Christine Connolly, a family physician at HealthPoint. Kyeremeh reported daily headaches and pain in her neck and lower back.  Connolly noted Dr. Leo's recommendation for more injections, but said "there is some concern about the financial status of the case."

Dr. Connolly drafted a narrative report of Kyeremeh's case on April 25, 2011.  Connolly stated that Kyeremeh's MRIs showed slight disc bulging in her lumbar spine area and a disc bulge in her cervical spine area.  Connolly noted that Kyeremeh was not at maximum medical improvement and that she (Connolly) anticipated Kyeremeh having permanent injuries.

Two days later, Kyeremeh saw Dr. James Gibson, a neurologist affiliated with HealthPoint.  Kyeremeh described constant neck pain and low back pain.  Upon examining her and reviewing her medical records, Gibson believed that chronic muscle spasms were causing pain in her neck and upper back, headaches, numbness, and tingling; he also believed there was a facet joint component to her neck, upper back, and lower back pain.  He noted that she was not a surgical candidate.

10

Dr. Connolly reported on May 2 that more injections were approved by Kyeremeh's medical finance provider.

In early and mid-May, around the one-year anniversary of Kyeremeh's accident, Dr. Gibson performed EMG tests[12] of Kyeremeh's neck, upper back, and lower back; the tests came back normal, which suggested Kyeremeh did not have nerve damage, leaving her facets as the likely source of her problems.  Gibson also became concerned that myogenic thoracic outlet syndrome, which involves the compression of spasming muscles on nerves, was causing numbness and pain in Kyeremeh's extremities.  He also noted that Kyeremeh had a moderately severe, chronic case of myofascial pain syndrome in her cervical and upper shoulder regions.[13]

Dr. Leo performed an injection to facets in Kyeremeh's cervical spine area on June 22, 2011.  She did not report much relief.

Kyeremeh's attorney, Mr. Frankl, filed a new notice of claim on her behalf with the USPS on July 1, 2011.

Kyeremeh's psychological care with Dr. Seefeldt ended on August 15, 2011, after approximately 23 visits over the course of seven months.  Dr. Seefeldt's closing summary noted lingering symptoms of depression, anxiety, and posttraumatic stress disorder, though her PTSD was in partial remission.  Those findings were based in significant part on Kyeremeh's own self-assessments.

On October 13, 2011, Dr. Gibson saw Kyeremeh and recommended that she undergo physical therapy.  Gibson did not see Kyeremeh again until October 2012.

---

[12] An EMG test evaluates and records electrical activity produced by skeletal muscles to determine nerve and muscle function.

[13] Myofascial pain syndrome is a chronic pain disorder caused by trigger points in muscles.

Dr. Connolly saw Kyeremeh on November 14, 2011.  Kyeremeh reported that physical therapy and acupuncture were helping.  Two days later, the USPS denied Kyeremeh's claim.

Kyeremeh was involved in a physical altercation with her daughter at their home on November 28.  Kyeremeh's hair weave was pulled out, she threw punches and brandished an iron, and she was punched and shoved.

During two visits in early December 2011, Kyeremeh reported to Connolly that she (Kyeremeh) was having spasms throughout her back, more-frequent headaches, significant increase in lower back pain, and substantial tenderness on her left side.

Kyeremeh filed this action on December 21, 2011.

Kyeremeh reported to Dr. Connolly on January 9, 2012 that her symptoms from early December had since improved.

Dr. Connolly performed trigger point injections on Kyeremeh's left side on February 2, 2012.  Kyeremeh reported immediate improvement in pain.  Connolly recommended physical therapy following the injection to help Kyeremeh's recovery.  Kyeremeh did not receive that therapy.

In February of 2012, Kyeremeh went on vacation to Las Vegas with her then-husband. She did not report to work for two days and did not give her supervisors advance notice that she would be absent.  Her employment with ProSource was terminated.

During a visit on March 7, 2012, Kyeremeh told Dr. Connolly that she lost her job because she took time off for "pain problems."  In the seven months following that visit, Kyeremeh did not receive health care of any kind.

Kyeremeh saw Dr. Gibson on October 4, 2012.  Gibson assessed her condition as about the same as it had been when he saw her a year before.  Kyeremeh reported being in pain at a

level of 5 out of 10.  Following that visit, Kyeremeh did not receive primary care or see a specialist for fifteen months; she visited emergency rooms at various times, as described below.

In February 2013, Kyeremeh began working as a telephone researcher at the Discovery Research Group.  Her employment was terminated a month later due to absenteeism.

On March 8, 2013, Kyeremeh was stopped by a police officer who saw her using a cell phone while riding a moped in traffic.  After the stop, she assisted the officer in pushing a stalled automobile out of traffic and into a parking lot.  A videotape of this activity is in evidence and Kyeremeh appears to have no difficulty with her physical movements.

Kyeremeh went to the University of Colorado Hospital on August 13, 2013 reporting substantial back pain, difficulty walking, and difficulty changing position.

Kyeremeh returned to the Discovery Research Group in September 2013.  She did not encounter meaningful limitations on her work there, nor did she require special accommodations.  Kyeremeh's employment was terminated two months into her tenure because she improperly accessed a client's confidential account.

On February 1, 2014, Kyeremeh was evicted from her home.  Postal Service inspectors who had been conducting periodic surveillance on Kyeremeh since August 2013 filmed her carrying furniture and boxes and otherwise ambulating without meaningful limitation while she moved out of her house.  Two days later, Kyeremeh went to St. Joseph's Hospital and reported lower back pain but subsequently left without receiving treatment or medication. On February 5, Kyeremeh went to University of Colorado Hospital complaining of stabbing pain in her lumbar spine and sacroiliac joint.

When Kyeremeh became eligible for Medicaid, either in late 2013 or early 2014 (it is unclear when, exactly), she began receiving primary care through Kaiser Permanente. Doctors at Kaiser examined her in March 2014. Kyeremeh informed the doctors that she might have pulled a muscle while moving out of her house the month before. The doctors noted that Kyeremeh has chronic back pain. They ordered physical therapy and prescribed her anti-inflammatories, muscle relaxants and anti-depressants.

Kyeremeh was prescribed medication in different amounts and combinations throughout the course of her treatment. None of her doctors reported that she was abusing her prescriptions. Kyeremeh went without medication for extended periods during that time.

## DISCUSSION

Kyeremeh seeks the following damages from the government caused by the May 14, 2010 accident: the value of her car and the reasonable rental rate of her temporary replacement vehicle; past medical expenses; future medical expenses; loss of income; loss of earning capacity and vocational retraining; and pain and suffering.

### 1. Value of Kyeremeh's car and rental car

The parties have stipulated that the value of Kyeremeh's car was $12,000.

Kyeremeh seeks the reasonable rental value of a replacement car at a rate of $210 per week. The evidence shows she rented a car for three weeks, which entitles her to $630.

### 2. Past medical expenses

Kyeremeh has submitted medical bills totaling $104,987.21, which includes interest on the medical liens against her. The government claims that Kyeremeh is a malingerer who has not been truthful in describing her symptoms and has consistently exaggerated her pain

complaints far beyond the objective evidence of her injuries, resulting in excessive, inappropriate, and unnecessary treatment.

The government relies on the testimony of Dr. Neil Pitzer, who conducted an independent medical examination ("IME") of Kyeremeh in August 2013 and reviewed her medical records.  In his opinion, the expected result of the trauma from the type of collision Kyeremeh was involved in is pain that is resolved within twelve to sixteen weeks.  Dr. Pitzer opined that none of Kyeremeh's diagnostic tests show objective evidence that she has any bodily injury that would cause the continuing pain she complains of, or require the care and treatment that has been provided to her.

The Court is skeptical about the testimony of Dr. Holmes, Dr. Ramos, and the physicians who saw her as independent contractors working with PremierCare and HealthPoint, since payment for their services largely depends upon her recovery in this case.  The fact that their records consistently include comments on causation heightens that skepticism.  It is nonetheless improbable that all of the medical professionals who have seen and treated Ms. Kyeremeh have been misled by her or are complicit in her pursuit of a large damages award.  Those physicians noted their belief that there were objective signs of injury during the course of Kyeremeh's treatment.  Muscle spasms were noted by Drs. Leo and Gibson.  Positive facet loading tests were reported by Jim Peterson.  Multiple providers viewing Kyeremeh's MRIs concluded that she had disc problems.  There is also testimony from Pastor James Royston, Bill Dalesio, Jim McLennan, Reina Cardoza, and Kyeremeh's two children that Kyeremeh has shown the limiting effects of pain, both physical and emotional, since the accident.

The preponderance of the evidence in this case supports a finding that the injuries Kyeremeh sustained when she was hit by the USPS truck resulted in pain in her neck and back and in emotional distress that required treatment.  That treatment has been problematic. Kyeremeh's financial circumstances and USPS' irresponsible denial of her claim required that she seek medical care on a lien basis; concerns over finances interrupted her treatment; and, in hindsight, some of the treatments she received were likely counterproductive or misdirected, the continuation of chiropractic care for 85 visits in spite of ongoing pain being the prime example.  Colorado law does not permit the government to escape liability by contending that her treatment was substandard.  See Redden v. SCI Colo. Funeral Servs., Inc., 38 P.3d 75, 81 n.2 (Colo. 2001) ("Colorado case law does not absolve tortfeasors of liability when the plaintiff's injuries result from medical treatment reasonably sought and directly related to the actions of the original tortfeasor.")

Kyeremeh's post-accident conduct must still be considered.  There are significant discrepancies between her activities and what she told her care providers.  For example, during Kyeremeh's physical altercation with her daughter in November 2011, Kyeremeh made movements, including raising her arms above her head, which went beyond the range of motion she claimed to be capable of.  There is also the March 2013 traffic stop, where Kyeremeh was observed speaking on a cell phone while riding a moped, and helped the stopping officer push a car from traffic; and her February 1, 2014 move, where Postal Inspectors saw her lifting heavy furniture and moving without apparent difficulty.  These events indicate that she exaggerated her condition to her treatment providers, which in turn led to exaggerated amounts of care.  It is also apparent that Kyeremeh failed to make a genuine effort to demonstrate her full physical capacity during her IME with Dr. Pitzer.

16

In addition, Kyeremeh was not a patient who conducted herself according to the medical advice she received.   Kyeremeh's November 2011 altercation with her daughter likely caused stress on Kyeremeh's neck (her hair weave was pulled off) and her body in general, which is reflected in the discrepancies between Kyeremeh's reports to Dr. Connolly concerning her condition before and after the incident.   She aggravated her back while moving heavy furniture in February of this year, as shown by her visits to the emergency room on February 3 and 5 and her admission to the Kaiser doctors that she may have pulled a muscle.   She smokes and does not exercise regularly, which has led to substantial weight gain.   Although the eggshell rule does not excuse a tortfeasor from paying for injuries that differ from what would normally be expected from an accident because of the unique vulnerabilities of the injured person, it does not excuse the injured person from carelessly engaging in conduct that exacerbates the conditions causing pain.

Because the preponderance of the evidence shows that Kyeremeh exaggerated and exacerbated her condition, she shares some responsibility with the government for her past medical expenses.   The complexity and volume of Kyeremeh's medical records does not permit the Court to precisely apportion responsibility between the parties.   Using its best approximation of relative causation, the Court will reduce Kyeremeh's claimed damages for past medical expenses by twenty percent, leaving $83,989.77 as the amount of the award.

## 3.  Future medical care

At Mr. Frankl's request, Dr. Pamela Knight performed an IME of Kyeremeh in June 2013, a little over three years after the collision.   Dr. Knight physically examined Kyeremeh, spoke to Kyeremeh, and reviewed her medical records.   Dr. Knight concluded that Kyeremeh had a central disc bulging at L4-5 and L5-S1, causing inflammation that was causing her

17

numbness, pain, and weakness in her extremities; and a disc protrusion in her cervical spine, causing inflammation and pain in her neck.  Dr. Knight's opinion is that Kyeremeh needs pain management care well into the future, which will include:  6 to 8 physician visits per year for 20 years at a cost of $1,800 – $3,600; 2 x-rays per year for 20 years ($12,000); 6 to 8 sets of cervical and lumbar x-rays over her lifetime ($12,000 – $16,000); 5-6 series of lumbar steroid epidural injections over her lifetime ($30,000 – $42,000); 4-5 series of cervical steroid epidural injections over her lifetime ($24,000 – $35,000); 50 physical therapy visits over her lifetime ($3,750 – $7,500); a health club membership for three years ($1,800); and additional lumbar and cervical facet injections ($6,000 - $8,000).  That adds up to a range of $91,350 – $125,900 in costs for Kyeremeh's medical follow through.  Dr. Knight puts the cost of Kyeremeh's pain and anti-inflammatory medication at $10,044 – $16,632 per year and states that Kyeremeh will need that medication for the remainder of her life.  Dr. Knight also seeks 20 to 30 Medrol Dosepaks to cover the remainder of Kyeremeh's life ($560 - $840).  There has been no evidence of Kyeremeh's life expectancy.

The preponderance of the evidence, giving particular weight to Dr. Knight's testimony, shows that Kyeremeh will probably need pain management well into the future as a result of the accident.  The extent and duration of Kyeremeh's required care is not clear.  All predictions of a patient's future care needs are necessarily somewhat speculative. Accounting for that uncertainty, the Court will limit Kyeremeh's possible recovery to $250,000, which is roughly the 20-year cost of Kyeremeh's future medical monitoring, treatment, and medication based on the conservative end of Dr. Knight's estimates.

Kyeremeh's future medical expenses are subject to the exaggeration and exacerbation considerations discussed in the section above.  In forming her opinion, Dr. Knight relied on

Kyeremeh's self-assessment in June 2013 and accepted Kyeremeh's self-reports in her medical records as valid. As discussed, Kyeremeh's descriptions of her pain and physical limitations are problematic. Kyeremeh's future medical needs are also the partial result of her own conduct exacerbating her condition. The same apportionment of causation made for Kyeremeh's past medical expenses is therefore appropriate to apply to her future expenses. Dr. Knight noted that some of Kyeremeh's future needs will result from the normal aging process, as well, which warrants a further reduction.

Accordingly, the Court will reduce its award of Kyeremeh's future medical expenses by thirty percent. Kyeremeh is entitled to $175,000 in future medical expenses.

### 4. Lost income

The parties have stipulated that Kyeremeh is entitled to $715 in lost earnings for the work days she missed following the accident.

Kyeremeh testified that, before the accident, she worked at ProSource for 55 hours per week on an hourly wage and earned approximately $3,000 in monthly income. Following the accident in May 2010, she worked reduced hours and earned only $2,100 per month. That continued through February 2012; Kyeremeh's employment was terminated one month later. For the $900 per month income differential over the course of 21 months, Kyeremeh seeks $18,900.

The testimony of Dan Pace with Sorin Group and Jim McLennan of ProSource shows that Kyeremeh's ability to perform full-duty custodial work was limited by her physical condition following the accident, which required her to go on light duty and reduce her hours. Accordingly, the evidence shows a causal link between Kyeremeh's accident and a reduction in her income during the remainder of her employment with ProSource.

Kyeremeh's claim of pre-accident monthly income is contradicted by her tax returns in the report of her vocational expert, Patrick Orbino.  In 2008, Kyeremeh reported gross earnings of $29,913, and in 2009, the year before the accident, Kyeremeh reported gross earnings of $30,765, or $852 more than in 2008.  She earned $29,913 in gross income in 2010, $26,755 in 2011, and $3,955 in the first two months of 2012, before she was fired.  The following calculation is warranted:

| YEAR | ESTIMATED EARNINGS IF NO ACCIDENT | ACTUAL EARNINGS | DIFFERENCE |
|------|-----------------------------------|-----------------|------------|
| 2010 | $31,617 ($852 more than in 2009) | $29,913 | $1,704 |
| 2011 | $32,469 ($852 more than in 2010) | $26,755 | $5,714 |
| 2012 | $5,553.50 ($33,321 annual income ($852 more than in 2011), divided by 12, multiplied by 2) | $3,955 | $1,598.50 |
| **TOTAL** | | | **$9,016.50** |

Accordingly, Kyeremeh is entitled to $9,016.50 in lost earnings for the 21 months she worked light duty at ProSource following the accident.

**5.  Vocational retraining and lost earning capacity**

Kyeremeh seeks $420,000 in damages for lost earning capacity and $12,000 for vocational retraining.

Dan Pace and Jim McLennan each testified that Kyeremeh was physically limited when she returned to work, and McLennan noted that he was not getting the same value from her when she came back.  Nonetheless, the Court is not persuaded that Kyeremeh was fired because of those limitations, or that, as Kyeremeh seems to insinuate, McLennan's

justification for firing her was a pretext for his dissatisfaction with her post-accident work performance; indeed, Mr. McLennan retained Kyeremeh and accommodated her circumstances for nearly two years following the accident.   The fact is that Kyeremeh was fired in March 2012 because she decided to skip work and go to Las Vegas without notice. The government should not be made to pay for the consequences of that poor decision.

According to Patrick Orbino, Kyeremeh is no longer physically capable of janitorial-style work, and should be limited to sedentary work which does not require extended periods of standing, walking, bending, twisting, lifting, pushing or pulling.   This will likely limit her employment opportunities, which were already limited by her criminal record, limited education, and spotty employment history.   Thus, Orbino recommends that Kyeremeh pursue vocational retraining that will give her the skills she needs to maintain sedentary employment.

There is no connection between the accident and Kyeremeh's ability to obtain and maintain a sedentary job.   Kyeremeh was able to maintain light-duty employment at ProSource until she was fired for going to Las Vegas without notice.   Kyeremeh was able to twice obtain a sedentary position with the Discovery Research Group.   Although she told Mr. Orbino she was unable to sustain the position because it required prolonged sitting and because she was in pain, the fact is that she was fired because of absenteeism on one occasion, and because she violated client confidentiality on another.   That has nothing to do with her physical limitations and everything to do with her inability to follow the rules of her employer.   In that regard, the Court notes that Kyeremeh was regularly late for her own trial.

Kyeremeh's other problem in proving loss of earning capacity is the methodology underlying Orbino's report.   For example, Orbino assumes Kyeremeh will not be able to

work for two years, even on a limited and part-time basis, and thus adds $60,000 in lost earning potential to the equation ($30,000 per year in lost income). Orbino does not adequately explain why he makes that assumption. It took Kyeremeh one year of unknown diligence in searching to find work at Discovery Research Group. Orbino also assumes Kyeremeh will only be able to find work that pays her between $12,000 and $20,000 a year on average, but again, he does not persuasively justify his position. In the Court's view, Orbino's report is too speculative, even for a loss-of-earnings assessment.

The Court declines to award Kyeremeh damages for vocational retraining and loss of earning capacity.

## 6. Pain and suffering

Kyeremeh seeks $230,000 in pain and suffering—$180,000 for past pain and suffering and $50,000 for future pain and suffering.

The government's position throughout the case has been, essentially, that Kyeremeh is faking it, citing Kyeremeh's "dancing" in the Sorin Group break room post-accident, her March 2012 moped ride, and her February 2014 move. There are good and bad days when it comes to pain. The Court does not doubt that the accident and its resulting fallout have put significant strain on Kyeremeh personally and on her relationship with her family.

While Kyeremeh has proven by a preponderance of the evidence that she has endured pain and suffering, and will have pain in the future, an appropriate pain-and-suffering award is $115,000.

## CONCLUSION

For the foregoing reasons, the Court finds and concludes that Plaintiff Levette Kyeremeh shall have and recover damages from Defendant United States of America in the amount of $396,351.27.

Dated:  June 5, 2014.

BY THE COURT:

**s/Richard P. Matsch**
_____

Richard P. Matsch
Senior District Judge